UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,  **REPORT AND**
 **RECOMMENDATION**

 Criminal No. 7-CR-212(A)(M)
                v.

MALIK BAZZI, et al.,

                Defendants.
_____

This case has been assigned to me by order of Hon. Richard J. Arcara for supervision of pretrial proceedings [37].[1] Before me is the motion of defendant Lakeith Fowler to suppress evidence seized from "The World is Yours", a store located in Dallas, Texas, on May 2 and 4, 2007 [241].[2]

An evidentiary hearing was held on June 23, 2009 [482], at which Joel Voyles, a private investigator with Investigation Services Company ("ISC"), and Margaret Martin, a police officer with the Dallas Police Department, testified on behalf of the government. Defendant Fowler did not present any witnesses. Thereafter, the parties filed post-hearing briefs [491, 513]. For the following reasons, I recommend that the motion be denied.

---

[1] Bracketed references are to CM-ECF docket entries.

[2] Fowler also seek a variety of non-dispositive relief which will be addressed in a separate Report, Recommendation and Order.

## BACKGROUND

On September 11, 2007, defendant Fowler (along with several others) was named in an indictment charging, *inter alia*, conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. §371 [1]. The investigation into his activities began when ISC, a company specializing in intellectual property crime, learned through informants that a store known as "The World is Yours", located at 337 East Ledbetter Road, Dallas, Texas, was allegedly selling counterfeit shoes [T8-9].[3] On May 2, 2007, an undercover private investigator purchased a pair of shoes from the store, which were identified as being counterfeit [T9]. Mr. Voyles also conducted surveillance of the store and observed UPS delivering eight boxes of sneakers that appeared consistent with the style of counterfeit Nike shoes [T10]. Consequently, Voyles entered the store and presented a cease and desist letter (Gov't Ex. 1) to defendant Fowler, who identified himself as Jeffrey Echols and stated that the owner of the store was not present [T10-12].[4] During the same conversation, defendant Fowler (identifying himself as Echols) conceded to Voyles that he was the owner of the store. [T19]. After being served with the cease and desist letter, defendant Fowler surrender 96 pairs of shoes to Voyles [T17-18; Def's Ex. 2]. However, he denied Voyles permission to enter the back room of the store [T35-36].

Notwithstanding the delivery of the cease and desist letter, Voyles subsequently learned that the store was continuing to sell counterfeit shoes [T12, 20]. Therefore, he contacted the Dallas police department [T34]. On May 4, 2007 an undercover private investigator and an undercover Dallas police officer entered the store, and the undercover private investigator

---

[3] "T" refers to the transcript of the June 23, 2009 suppression hearing [482].

[4] Echols was later positively identified by Voyles as Fowler [T12].

-2-

purchased a pair of shoes and sunglasses with a $100 bill [T21-22, 29, 44]. The purchased items were brought outside to Voyles, who identified the items as counterfeit to Dallas police officers [T, 22, 44]. This prompted five uniformed police officers and three investigators from ISC to enter the store [T23, 45, 56]. The officers secured the premises [T23]. They did not have their guns drawn [T46].

The officers encountered Christopher Christian, a clerk [T45-46]. No other individuals were discovered within the store [T58]. Christian gave the officers permission to look around [T46-47]. However, Officer Martin did not specifically ask Christian if they could look around anywhere other than inside the first floor store area [T55]. When asked, Christian also opened the cash register and the officers retrieved the $100 bill used by the undercover private investigator to buy the counterfeit goods [T45].

The officers proceeded to the rear of the building where Christian had gone to retrieve the shoes he sold to the undercover private investigator earlier that day [T48, 58]. They also "went to the back of the building, [where] there was a stairwell that went upstairs" [T48, 46]. At the top of the stairwell, an individual who identified himself as an employee of Gins Mart, the owner of the indoor bazaar in which the store was located, was replacing the lock to an open door [T46, 48, 55]. When the officers reached the top of the stairwell, they observed that the open door led to large room storeroom with "shoes everywhere". Id.; Gov't Exs. 2-6.

Voyles identified the counterfeit items to the police officers [T23]. He identified the shoes as being counterfeit by the quality of the boxes, the labels on the boxes, and the use of silicone gel packs, which are not used by Nike to package its products [T24-25, 50]. Six to eight

pairs of shoes in the upstairs store room were pulled at random, and Voyles confirmed with Nike that these were counterfeit [T51]. He communicated his findings to Officer Martin [T25-26].

Officer Martin described the store as being part of "like an indoor flea market" which contained a number of different stores [T54]. A rear loading dock also led into the store [T57-58]. There were three doors separating the storeroom from the store [T57]. However, Martin did not recall whether she had to leave the store in order to access the stairwell leading to the storeroom [T61]. Other stores had access to the hallway where the storeroom was located [T63]. Martin had no knowledge of other stores using the upstairs storeroom, which contained merchandise that was only sold by the store [T63], but also did not have any information indicating that Fowler purchased, owned, or was associated with the shoes located in the storeroom [T62]. Voyles did not know whether the public was permitted in the storeroom, but speculated that it could be used for wholesale purposes by the way the shoes were displayed [T38-39].

ISC paid for a U-truck, which arrived approximately 45 minutes later, to remove approximately 850 pairs of sneakers and other counterfeit items that were seized by the police officers [T26, 39-40, 51]. Fewer than ten pairs of shoes were seized from the public area of the store [T37]. No one was arrested on May 4, 2007 [T52].

When asked whether the police intended on obtaining a search warrant, Officer Martin responded that "we were not expecting to find this room with all these shoes in it. We had no idea that there was going to be that much product in that location, so we did not. We had the undercover buy. We went into the store. Once we got up to the stairs and actually saw, at that point it was kind of - - would have been redundant to get a search warrant since it was all in

plain site (*sic*)" [T52-53]. She also testified that they did not consider obtaining a search warrant because "we weren't looking for product. We were looking for people. Again, it's a very high crime area. The location itself, the Gins Mart, is known to be a criminal area where criminal activity takes place. So we were more looking for bodies for our own safety just to make sure that nobody was going to come out of the woodwork" [T57].

## ANALYSIS

**A.    Evidence Seized on May 2, 2007**

The protection provided by the Fourth Amendment applies "only [to] governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Accordingly, defendant Fowler concedes that "the original purchase made on May 2, 2007, is admissible for purposes of the Motion to Suppress, as the activity did not deny a constitutional right, nor was government involved in the activity." Fowler's brief [491], p. 7; [T66].

For the same reason, defendant Fowler's surrender of 96 pairs of shoes to Voyles on May 2, 2007 [T17-18, 29] was not subject to Fourth Amendment protection, because the goverment was not involved in that transaction. Therefore, I recommend that defendant Fowler's motion be denied to the extent that it seeks to suppress the evidence seized on May 2, 2007.

**B.     Evidence Seized on May 4, 2007**

My analysis as to the propriety of the May 4, 2007 search and seizure "begins . . . with the basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions". <u>Arizona v. Gant</u>, ___U.S. ___, 129 S.Ct. 1710, 1716 (2009).  "A defendant seeking to suppress evidence seized during a warrantless search bears the burden of showing that he had a reasonable expectation of privacy in the place or object searched . . . . If the defendant makes such a showing, then the burden shifts to the government to show that the search fell within one of the exceptions to the warrant requirement." <u>United States v. Sparks</u>, 287 Fed.Appx. 918, 919 (2d Cir. 2008)(summary order).

Because distinct Fourth Amendment concerns are implicated with each aspect of the events of May 4, 2007, I have treated each search and seizure separately.

**1.     The Undercover Purchase**

Defendant Fowler argues that "the decision by police to go to the [store] on the 4th without a warrant was the beginning of the wrongful search and seizure of the property located at the store.  The fact that the police sent or accompanied someone into the store to make an 'undercover' purchase was a seizure which was not reviewed by a magistrate." Fowler's brief [491], p. 11.  In response, the government argues that the undercover private investigator was not acting as an agent of the police, and even if he was acting in this capacity, defendant Fowler has not established standing to contest the search.  Government's response [513], p. 18, 20-22 n. 6.

However, even if I were to assume that defendant Fowler has standing to contest the search of the store and that the undercover private investigator was acting as a police agent on May 4, 2007 when he purchased the counterfeit goods, I would nevertheless conclude that the Fourth Amendment was not implicated by the search and seizure that occurred. Entry into the store required no Fourth Amendment justification, since "the store was a public place. It was open to the public, and the public transacted business in the store. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." United States v. Ladoucer, 2007 WL 3452785, *9 (D.Minn. 2007) (*quoting* Katz v. United States, 389 U.S. 347, 351 (1967)); Lewis v. United States, 385 U.S. 206, 211 (1966) ("When . . . the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant."); United States v. Dunford, 983 F. Supp. 658, 666 (W.D.Va. 1997) ("The defendant's stalls were open to the public and individuals were invited to enter and transact business. I find that the expectation that a law enforcement official would not come into the stalls and discover the contraband is not one society would recognize as reasonable.").

The May 4, 2007 purchase by the undercover private investigator also did not constitute a seizure. "A seizure occurs when there is some meaningful interference with an individual's possessory interests in the property seized . . . . Here, respondent voluntarily transferred any possessory interest he may have had in the magazines to the purchaser upon the

receipt of the funds . . . . Thereafter, whatever possessory interest the seller had was in the funds, not the magazines. At the time of the sale the officer did not 'interfere' with any interest of the seller; he took only that which was intended as a necessary part of the exchange." Maryland v. Macon, 472 U.S. 463, 469 (1985). "An undercover officer does not violate the Fourth Amendment merely by accepting an offer to do business that is freely made to the public. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." Id. at 470.

Defendant Fowler argues that "the 'purchase' became a seizure once the money used for the 'purchase' was retrieved by the police". Fowler's brief [491], p. 11. I do not agree. "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . . and not on the officer's actual state of mind at the time the challenged action was taken. Objectively viewed, the transaction was a sale in the ordinary course of business. The sale is not retrospectively transformed into a warrantless seizure by virtue of the officer's subjective intent to retrieve the purchase money to use as evidence." Macon, 472 U.S. at 470-71. Even "assuming . . . that the retrieval of the money incident to the arrest was wrongful, the proper remedy is restitution or suppression of the $50 bill as evidence of the purchase, not exclusion from evidence of the previously purchased magazines." Id. at 471.

Defendant Fowler argues that Macon is distinguishable from the circumstances presented here because in Macon the police only "intended to make an arrest and were not intent on seizing the contents of the store". Fowler's brief [491], p. 12. However, as discussed above,

-8-

Macon holds that the subjective intent of the officers is irrelevant. 472 U.S. at 470-71; *see also* Whren v. United States, 517 U.S. 806, 814 (1996) ("The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." (emphasis in original)). With respect to the police officer's later seizure of counterfeit items from the store, "the only appreciable differences between the procedure in Macon and in this case are the facts that First Amendment materials were not involved, a factor mitigating against suppression, and the fact that merchandise was seized, not purchased. This latter difference does not render [the government's] actions unconstitutional." Dunford, 983 F. Supp. at 666. Therefore, I recommend that the items purchased by the undercover private investigator on May 4, 2007 not be suppressed.

**2.   Search of the Store**

When the uniformed police officers and ISC investigators entered the store, they seized fewer than ten pairs of shoes from the public area of the store [T37] and the $100 bill used by the undercover private investigator to purchase the counterfeit goods [T45]. For these seizures, the government relies on the plain view and consent exceptions to the warrant requirement. Government's response [513], pp. 23-25.

As discussed above, entry into the store following the purchase of counterfeit goods by the undercover private investigator required no Fourth Amendment justification. *See* Ladoucer, 2007 WL 3452785 at *9   Although retail stores that invite the public to enter do not "consent[ ] to wholesale searches and seizures that do not conform to Fourth Amendment guarantees", no wholesale search and seizure occurred here. Lo-Ji Sales, Inc. v. New York, 442

U.S. 319, 329 (1979). Christian, the store's clerk, gave his consent for the police to search the store [T, 47] and also voluntarily opened the cash register [T, 45].

The government bears the "burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Defendant Fowler suggests that Christian's consent was involuntarily given, but offers no evidence to rebut Officer Martin's testimony that he voluntarily consented to the search and that the officers did not have their guns drawn when they asked Christian for his consent. Fowler's brief [491], p. 13 ("The officers went into the store with a show of force and purportedly asked if it was okay to look around. This is obviously an attempt to avoid the warrant requirement by trying to make the search a consensual search."). Defendant Fowler also notes that Officer Martin testified that Christian responded "yes", when he was asked whether he minded if the officers looked around [T46-47]. Although this testimony would appear to indicate that Christian denied Officer Martin's request to look around, when asked what she would have done had he not responded "yes", she testified "we would have contained where we were" [T47]. Additionally, when asked whether it was her testimony that "Mr. Christian said to you that you could, in fact, look around", Officer Martin responded "that's correct" [T47].

"The 'plain view' doctrine will justify a warrantless seizure of incriminating evidence and contraband provided the police officer's initial intrusion was lawful, such that the officer can justify being in a position to make the discovery, and that officer must have a reasonable belief that the item seized is evidence of a crime." United States v. Hernandez, 2001 WL 1344832, *14 (W.D.N.Y. 2001) (Foshio, M.J./Elfvin, J.). Once lawfully in the store and having consent to search, the police officers had authority to seize contraband and evidence in

plain view. This includes the $100 used by the undercover private investigator to purchase the counterfeit items, which was in plain view after Christian voluntarily opened the cash register, and the counterfeit shoes located in the public area of the store. The fact that the police officers were aware that this contraband and evidence was present in the store as a result of the controlled buys does not invalidate the plain view seizures that occurred. *See* Horton v. California, 496 U.S. 128, 130 (1990) ("Even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition.").

Defendant Fowler argues that "the only 'evidence' that [the seized items] were counterfeit was Mr. Voyles assurance". Fowler's brief [491], p. 12. However, a similar method was employed in Dunford, in which the arresting officer was accompanied by an individual trained in identifying counterfeit merchandise to search a stall operated by the defendant that was open to the public for the sale of goods. The court found that the arresting officer "viewed the goods displayed as any buyer could have done. As he testified, by merely handling the merchandise, or in some instances by simply looking closely at the goods, he or his associate could determine whether the goods in question were contraband. Accordingly, when he determined that the merchandise was counterfeit he was entitled to seize it." 983 F. Supp. at 666.

Defendant Fowler further argues that "intent on seizing items, the police deliberately chose not to take the case before an independent magistrate prior to going to the location where they intended to seize merchandise, and the police again deliberately chose not to take the case before an independent magistrate after the second 'buy.'" Fowler's brief [491], p. 8. However, as discussed above, the subjective intent of the officers is irrelevant, as is the fact that

the police officers also had the time and probable cause to obtain a search warrant for the store. Therefore, I recommend that the sneakers and $100 bill seized from the store not be suppressed.

    **3.    Search of the Storeroom**

Defendant Fowler argues that the evidence seized from the storeroom should be suppressed because the government did not establish that a protective sweep was necessary. Fowler's brief [491], p. 13. Without reaching the merits of that argument, the government argues that defendant Fowler has not shown an expectation of privacy in the storeroom. Government's response [513], p. 28. I agree with the government.

Defendant Fowler failed to testify or offer other evidence establishing a possessory interest or reasonable expectation of privacy in the storeroom or its contents, as he was free to do,[5] nor did he contradict Officer Martin's testimony that "there were other stores that could have accessed the hallway and, therefore, the storeroom" [T63]. While he argues that "the evidence should not be available to the government to use in his trial as without standing there is nothing to show that defendant was associated with this store", defendant Fowler's brief [491], p. 14, whether the seized evidence can be tied to him is an issue for determination at trial, not on a suppression motion.

---

    [5]    "[I]t is clear that testimony given to meet standing requirements for motions to suppress cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." United States v. Meyer, 157 F. 3d 1067, 1080 n. 5 (7th Cir. 1998); United States v. Ochs, 461 F. Supp. 1, 6 (S.D.N.Y 1978), aff'd, 636 F. 2d 1205 (2d Cir.1980), cert. denied, 451 U.S. 1016 (1981).

Since I find no basis to conclude that defendant Fowler had a reasonable expectation of privacy in the storeroom, I therefore recommend that his motion to suppress the items seized from that storeroom be denied.

**CONCLUSION**

For these reasons, I recommend that Fowler's motion to suppress [241] be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 3, 2010 (applying the time frames set forth in Fed. R. Crim. P. 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 58.2(a)(3) may result in the district judge's refusal to consider the objection.

**SO ORDERED**.

DATED: April 14, 2010

                                            /s/ Jeremiah J. McCarthy
                                            JEREMIAH J. MCCARTHY
                                            United States Magistrate Judge